# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CT-01683-SCT

*REBECCA L. JACKSON AND GARY JACKSON*

*v.*

*STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY*

## <u>ON WRIT OF CERTIORARI</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 10/12/2001 |
| TRIAL JUDGE: | HON. MICHAEL R. EUBANKS |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | LAMPTON O. WILLIAMS, JR. |
| ATTORNEYS FOR APPELLEE: | BILLY W. HOOD |
| | JEFFREY G. PIERCE |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED - 08/19/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1. This insurance coverage case is before this Court on writ of certiorari to review the judgment of the Court of Appeals which reversed the summary judgment of the Circuit Court of Pearl River County dismissing the insureds' suit against the insurer as untimely.

¶2. Finding that the circuit court's grant of summary judgment was eminently correct, we reverse the judgment of the Court of Appeals and affirm the judgment of the circuit court.

**FACTS & PROCEDURAL HISTORY**

¶3.     On February 10, 1995, while stopped in her car at an intersection, Rebecca L. Jackson was "bumped" from behind by the vehicle driven by John Bordelon. Bordelon had insurance coverage at the time of the accident.[1] The car Rebecca was driving was insured with State Farm Mutual Automobile Insurance Co. in the name of her husband, Gary Jackson. The damage to the Jacksons' vehicle was described as two scratches, and Bordelon's insurance carrier ultimately paid $181.00 to repair the vehicle. The Jacksons did not notify State Farm about the accident.

¶4.     Rebecca went to the emergency room that evening complaining of neck pain and Xrays and a CAT scan were taken of her cervical spine. She was given prescriptions and referred to a neurosurgeon if she had additional problems. Approximately two weeks later Rebecca saw the neurosurgeon and complained of neck pain and lower back pain. More Xrays were taken, and she was prescribed a few weeks of physical therapy and was to return when that was complete. On May 4, 1995, Rebecca returned to the emergency room complaining of increased pain in her lower back. An MRI revealed "[d]egenerative disc disease at L3-4, L4-5, and L5-S1 with central disc herniation and marginal spurs." On May 10, 1995, Rebecca saw the neurosurgeon again. The records from that visit reveal that Rebecca postponed the prescribed physical therapy so that she could visit her husband in California, but that once she began therapy that it helped the neck pain. The medical records also discuss that her lower back pain had increased and that she went to the emergency room. Specifically, the medical records state,

> She was seen in the Emergency Room by Dr. Floyd with these complaints. He obtained an MRI scan of the lumbosacral spine which shows considerable degenerative disc disease at L3-4, L4-5 and L5-S1. In fact, at the L4-5 level there is a probable central disc herniation which effaces the sac and the L5 roots.

---

[1] Bordelon was 18 at the time and was driving his mother's car. His mother's insurance covered him as a permissive driver. His mother will be referred to as "Ratcliff."

The neurosurgeon further stated that he and Rebecca discussed the "focal disc rupture centrally at L4-5," that he recommended additional conservative measures of treatment for her lower back, and "*[s]he is in complete agreement with this approach.*" (emphasis added). Rebecca continued with physical therapy treatments, home exercises, and visited with the neurosurgeon again on June 7, 1995. He noted that she showed significant improvement even though she had missed several physical therapy sessions. On August 14, 1995, Rebecca and Gary saw the neurosurgeon together. Even though she failed to do her home exercises as prescribed, her neck and back pain had diminished considerably and she had "virtually no neck discomfort." The doctor declared that she had reached "maximum medical improvement" and released her from his care. All of the medical records indicate that the neurosurgeon fully discussed the prognosis with Rebecca and that she understood and agreed with him.

¶5.    Some time before December 22, 1995, Rebecca and Gary hired an attorney to represent them against Bordelon. On November 10, 1997, two years and nine months after the accident and two years and four months after reaching maximum medical improvement, Rebecca returned to the neurosurgeon for reassessment. The medical records from that visit reveal that Rebecca called his office during the previous year "complaining of neck, back and/or leg pain" and had failed to show up for several visits. The neurosurgeon also states that he "reviewed the patient's lumbar MRI scan with findings as outlined previously. I discussed the situation with Ms. Jackson." Rebecca was again prescribed a course of physical therapy and home exercise. Rebecca saw the neurosurgeon again on December 10, 1997, and January 28, 1998, both times reporting that her condition was improving with physical therapy and home exercise. On January 28, 1998, she reported that she was pregnant and the neurosurgeon advised her to discuss her treatment with her other physician.

¶6.     On February 3, 1998, just a few days before the statute of limitations would run, Rebecca and Gary filed their complaint against Bordelon and Ratcliff in the Circuit Court of Pearl River County. The Jacksons alleged that Bordelon was negligent and caused the February 10, 1995, collision and that Rebecca "was caused to suffer *serious, permanent, painful and disabling injuries*." (emphasis added). Gary and Rebecca sought damages, which included compensation for Rebecca's "personal injuries and personal disability," her past, present and future medical expenses, lost wages, and Gary's loss of consortium.

¶7.     Rebecca returned to the neurosurgeon again on October 8, 1998. The medical records for the visit reveal that Rebecca delivered her baby about a month earlier and that she was experiencing back pain. The medical records state "any lifting will aggravate that pain" and that the neurosurgeon "discussed the situation with Ms. Jackson in some detail." Rebecca was again prescribed a course of physical therapy and home exercise and agreed that her non-compliance with the exercise program was a problem.

¶8.     On January 4, 1999, counsel for Bordelon and Ratcliff served their responses to the Jacksons' first set of interrogatories. In those responses Bordelon and Ratcliff stated that they had insurance coverage for the accident with Mississippi Farm Bureau Insurance Company with coverage limits of $20,000 per person and $50,000 per accident.

¶9.     Rebecca returned to the neurosurgeon again on September 1, 1999. The medical records for the visit state that when Rebecca called for the appointment she was having "tremendous problems with her lower back" because she had stopped doing her home exercises, but that she started doing them again and on the date of the visit was not having any pain.

¶10.    On November 18, 1999, the Jacksons' attorney sent a letter to the neurosurgeon asking for his opinion to assist the Jacksons in their claim for personal injuries. The letter asked a total of five questions

4

and provided two blanks under each question for the doctor to mark "yes" or "no." The doctor's responses restated his diagnosis and treatment discussed above. He signed his fill-in-the-blank responses before a notary public on November 23, 1999, and returned them to the Jacksons' attorney.

¶11. On January 10, 2000, counsel for Bordelon and Ratcliff sent a letter to the Jacksons' attorney advising him that the coverage amount stated in the response to interrogatory number 10 erroneously stated that the limit was $20,000 per person, when the limit was actually $25,000 per person. On that same day, the Jacksons contacted their local State Farm agent and reported their underinsured motorist claim arising from the February 1995 accident. On January 27, 2000, the Jacksons' attorney gave State Farm notice of the lawsuit filed in February 1998 and provided State Farm with a copy of the complaint. On April 18, 2000, as part of its investigation of the claim, State Farm took Rebecca's sworn statement. In response to questions, Rebecca stated approximately 20 times that she could not remember facts and details relevant to the case. Following its investigation, State Farm concluded that the claim was time-barred pursuant to the Mississippi statute of limitations and that the Jacksons had failed to meet policy and statutory requirements concerning timely notice of claims and actions against the owner or operator of an underinsured vehicle and denied the Jacksons' claim.

¶12. On July 12, 2000, five years and five months after the accident, the Jacksons filed their amended complaint adding State Farm as a defendant. State Farm filed a motion for summary judgment, the Jacksons filed a response in opposition, and both parties submitted briefs. On September 21, 2001, the circuit court entered a twelve-page opinion and order, in which the trial court made findings of fact and conclusions of law and granted State Farm's motion for summary judgment.

¶13. The circuit court found that the policy entered into between State Farm and Gary Jackson, an independent insurance adjuster, required that the insured "give State Farm notice of an accident or loss 'as

5

soon as reasonably possible,' and, if suing an uninsured motorist, provide State Farm with 'a copy of all suit paper.'" The circuit court noted that the Jacksons filed suit in February 1998 for Rebecca's "severe, permanent and disabling injuries" and that, "at the time of filing suit, the Jackson's were under the belief that Defendant Ratcliff's automobile insurance had policy limits of 20/50/20." In a footnote, the trial court noted that the Jacksons later learned that the coverage was actually $5,000 higher per person. The circuit court noted that the Jacksons admit that they did not give State Farm any notice until January 10, 2000. The circuit court also stated,

> The Jackson's claim they were unaware of the extent of R. Jackson's injuries until her doctor, Dr. Kerry L. Bernardo checked the "Yes" box to five "yes or no" questions submitted to him in a letter dated November 18, 1999 ostensibly sent from Jackson's counsel. The Jackson's waited another approximately two months after receiving these "check the box" responses from Dr. Bernardo before finally informing State Farm of their underinsurance claim. State Farm took the Jackson's sworn statements on April 18, 2000 and sometime shortly afterwards denied their underinsurance claim.

After discussing statutory and case law, the circuit court applied that law to the facts of this case. The circuit court found that summary judgment was proper.

¶14. On October 16, 2001, the trial court entered the judgment of dismissal as to State Farm. The Jacksons appealed, and the case was assigned to the Court of Appeals. The Court of Appeals held that disputes of material fact required the case to be reversed and remanded. *Jackson v. State Farm Mut. Auto. Ins. Co.*, 852 So.2d 641, 642 (Miss. Ct. App. 2003). State Farm's has filed its petition for writ of certiorari, which is supported by the *amicus curiae* brief of the Mississippi Defense Lawyers Association. The Jacksons have filed a response in opposition to the petition.

## ANALYSIS

¶15. The parties, the circuit court, and the Court of Appeals agree that the issues in this case are governed by this Court's decisions in *Harris v. American Motorist Ins. Co.*, 240 Miss. 262, 126

6

So.2d. 870 (1961), *Vaughn v. State Farm Mutual Automobile Ins. Co.*, 445 So.2d 224 (Miss. 1984), and *Lawler v. Government Employees Ins. Co.*, 569 So.2d 1151 (Miss. 1990). It is the application of that law to the facts of this case where the disagreement arises. After careful consideration we find that the record in this matter clearly supports the circuit judge's decision to grant summary judgment.

¶16.    The Court of Appeals first found that "the Jacksons' legal obligations for timely notice as opposed to timely litigation are controlled by different rules and precedent." *Jackson*, 852 So. 2d at 643. The Court of Appeals first discussed the timeliness of notice and determined that the obligation of timely notice could arise from the insurance policy[2] and from statutes. *Id.* at 644 (citing Miss. Code Ann. § 83-11-105). The Court of Appeals then held,

> ¶16. Though the Jacksons failed to comply with the notice provisions under their policy and Mr. Jackson failed to give the notice required once he joined in a suit, these omissions are not outcome determinative. The Supreme Court has held that where an insurance policy requires notice as a condition precedent to coverage, coverage may still be allowed unless the insurer suffered prejudice due to delay; that prejudice is a question of fact. *Harris v. American Motorist Ins. Co.*, 126 So.2d 870, 873 (Miss. 1961). A more recent precedent reached the same conclusion. "Because the questions of timely notice and prejudice were questions of fact for the jury to decide, the circuit judge erred in granting GEICO's motion for summary judgment." *Lawler v. GEICO*, 569 So.2d 1151, 1153 (Miss. 1990).
>
> ¶17. State Farm argues that the existence of prejudice was clear from the undisputed facts and that therefore summary judgment was permissible on this issue. We need not determine whether prejudice is such a subjective standard as never to be the subject of

---

[2] The Court of Appeals incorrectly defined "insured" under the policy. The Court of Appeals incorrectly stated, "[t]he 'insured' in the present suit was not the injured party, Mrs. Jackson, but her husband. Mrs. Jackson's obligations arose under a different provision of the policy if she sought underinsured motorist coverage." *Jackson*, 852 So. 2d at 644. Actually, pursuant to the uninsured motorist coverages, the policy defines the insured as the person named on the declarations page and his or her spouse. Accordingly, Rebecca not only had the obligations discussed by the Court of Appeals as the injured person, but also had the same obligations as Gary as the insured.

summary judgment even when significant harm to an insurer is undisputed. It is enough to say that this is not such a case.

*Jackson*, 852 So. 2d at 645. The Court of Appeals then held that the circuit judge erred when he granted summary judgment based on late notice and "[t]he question of prejudice remains a fact issue for consideration on remand." *Id.*

¶17.    The Court of Appeals next discussed the application of the statute of limitations. Citing *Lawler* and *Vaughn* supra, the Court of Appeals held,

> We interpret the two decisions as being consistent. At least when there is reasonable uncertainty about whether the other party to an accident has adequate insurance, there is under this caselaw no accrual of a cause of action under a person's uninsured motorist policy.
>
> ¶ 23. We note that *Lawler* did not require that the absence of coverage be determined in litigation before a cause of action for uninsured coverage commences. To that extent, *Lawler* applies the clarification that what is necessary for the accrual of a cause of action is some level of assurance that there is not going to be insurance from the tortfeasor. A court judgment is not always needed.

*Jackson*, 852 So. 2d at 646 (citing *Lawler*, 569 So. 2d at 1153; *Vaughn*, 445 So. 2d at 226).

Applying its analysis to the facts of this case, the Court of Appeals held,

> ¶ 25.  We synthesize these precedents and apply them to our facts as follows. Once someone who possesses uninsured motorist coverage knows, or reasonably should know, that the damages he or she claims to have suffered exceed the limits of insurance available to the alleged tortfeasor, the cause of action against the uninsured motorist carrier has accrued. It is at this point in time the potential plaintiff has a legally enforceable claim against the uninsured motorist carrier. This conclusion is based on *Lawler's* clarification of *Vaughn*, which we apply by analogy to the situation that we face of insufficient primary insurance.
>
> ¶ 26.  By statute and by insurance policy terms, notice of the claim must first be given the insurance company. MISS. CODE ANN. § 83-9-5(e) (Rev. 1999). No suit may be brought sooner than sixty days after written proof of loss has been given nor later than three years after the proof of loss. MISS. CODE ANN. § 83-9-5(k)(Rev. 2002). Therefore, if the Jacksons became, or should have become, aware of the shortfall in coverage under the tortfeasor's own policy more than three years before they joined State

8

Farm in this litigation, their suit against State Farm fails. We do not have sufficient evidence on this summary judgment to state that the issue is beyond factual dispute.

*Jackson*, 852 So. 2d at 646.

¶18. Finally, the Court of Appeals rejected the Jacksons' argument that no cause of action against the insurer accrues until there has been a denial of the claim by the insurer. The Court of Appeals stated, "[t]he difficulty with finding that no cause of action accrues until there is a denial of the claim, is to leave in the hands of the claimant an unlimited period of time to wait, intentionally or inadvertently, before making a claim. Only thereafter would the statute of limitations commence." *Id.* at 647. The Court of Appeals concluded,

> ¶ 29. Still, waiting until the last possible moment under the statute of limitations to notify an insurer such as State Farm is not in either the insured or the insurer's best interests. To state that the cause of action does not accrue until the time we have identified, does not in any manner delay the contractual or even the statutory obligation of notice. As we have pointed out, the concept of prejudice will determine whether a breach of the notice obligation will cause coverage to be lost. That prejudice may prevent coverage even if the statute of limitations does not.

*Id.*

¶19. The holding in *Harris* does not support the Court of Appeals' conclusions, and in fact, supports summary judgment. In *Harris*, the chancellor found that the insured's notice to the insurer, more than thirteen months after the accident, was not timely and entered judgment in favor of the insurer. *Harris v. Am. Motorist Ins. Co.*, 126 So.2d 870 (1961). In that case, the insured argued that the insurer had not been prejudiced by the failure to give timely notice. This Court affirmed the chancellor, and held that the insured has the "duty to exercise reasonable care, due diligence as a reasonable and prudent man, to acquire information about the accident, so that he may be readily informed about claims out of which damage may arise." *Id.* at 873 (citations omitted).

¶20.    Contrary to the Court of Appeals' holding, there are no questions of material fact in the present case.  The medical records, provided by the Jacksons, show that on May 10, 1995,  Rebecca and her doctor discussed her "considerable degenerative disc disease at L3-4, L4-5 and L5-S1," and the "probable central disc herniation" at the L4-5 level, and the "focal disc rupture centrally at L4-5."  The medical records also show that Rebecca and her doctor discussed this diagnosis again in June and August 1995.  As pointed out in the circuit court's opinion, Rebecca and Gary sued Bordelon on February 3, 1998, for Rebecca's "serious, permanent, painful and disabling injuries."  The Jacksons' contention that they were unaware of the extent of her injuries until her doctor filled out the check-the-box questions in November 1999, is clearly contrary to the evidence in the record.

¶21.    Additionally, the Jacksons' argument that they did not know that Bordelon's insurance would be inadequate until they were advised that he actually had $5,000 more in coverage, defies logic.  The circuit court found that in February 1998, when they filed suit against Bordelon, the Jacksons were under the impression that Bordelon's insurance coverage was limited to 20/50/20 and they knew they carried their own underinsurance coverage.  It is clear from the record that the Jacksons added State Farm to the suit more than three years after they knew the extent of Rebecca's injuries and knew the amount of Bordelon's insurance coverage.  Accordingly, their claims against State Farm are barred by the three-year statute of limitations, Miss. Code Ann. § 15-1-49 (Rev.2003).

¶22.    This Court has stated that notice confers valuable rights upon the insurer.  Timely notice protects the insurer's right to investigate the events underlying the claim and allows the insurer to make decisions regarding the defense of that claim.  ***Ross v. Crane Co.***, 350 So.2d 697, 699 (Miss. 1977);  *see also* ***Jackson***, 852 So. 2d at 644 (citing 8 Appleman, Insurance Law & Prac. § 4731 (Rev. 2002)); ***State Mut., etc., Ins. Co. v. Watkins***, 181 Miss. 859, 180 So. 78, 80 (1938); ***Downing v. Home Indem.***

*Co. of New York*, 169 Miss. 13, 152 So. 841, 842 (1934).  The record shows that, after finally being notified in January 2000 about the February 1995 accident, State Farm attempted to investigate the Jacksons' claim, including taking Rebecca's sworn statement.  The record shows that Rebecca could not remember important facts and details regarding the claim.   She could not even remember if her car had been repaired.  Pursuant to this Court's holdings in *Harris*, *Vaughn*, and *Lawler*, the prejudice suffered by State Farm in this case is clear.  We hold that summary judgment was proper.

### CONCLUSION

¶23.    For the foregoing reasons, we reverse the Court of Appeals' judgment and affirm the trial court's grant of summary judgment.

¶24.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR.   GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.   DIAZ, J., NOT PARTICIPATING.**